586 F.2d 280
 TOWN COURT NURSING CENTER, INC.
and
Emma Cooper, Mary Crawford, Hazel Kemp, Arnold L. Phillips,
Delphine Taddei, Nancy Truitt, Individually and on behalf of
the class of patients eligible for Pennsylvania Medical
Assistance Program benefits at Town Court Nursing Center, Inc.
v.
Frank S. BEAL, Individually and in his capacity as Secretary
of Public Welfare of the Commonwealth of Pennsylvania, and
Joseph A. Califano, Jr., Individually and in his capacity as
Secretary of the United States Department of Health,
Education and Welfare.
Appeal of Emma COOPER, Mary Crawford, Hazel Kemp, Arnold L.
Phillips, Delphine Taddei and Nancy Truitt, Individually and
on behalf of the class of patients eligible for Pennsylvania
Medical Assistance Program benefits at Town Court Nursing
Center, Inc., in No. 77-2222.
Appeal of Joseph A. CALIFANO, Jr., Secretary of the United
States Department of Health, Education and
Welfare, in No. 77-2444.
 Nos. 77-2222 and 77-2444.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 4, 1978.
Resubmitted En Banc July 10, 1978.
Decided Sept. 29, 1978.
As Amended Oct. 13, 1978.
 
 William F. Coyle, Philadelphia, Pa., for Emma Cooper, et al., appellants in No. 77-2222.
 Maria Parisi Vickers, Asst. Atty. Gen., Michael von Moschzisker, Deputy Atty. Gen., Eastern Regional Director, Robert P. Kane, Atty. Gen., Philadelphia, Pa., for Frank S. Beal, appellee in No. 77-2222.
 Jeffrey B. Albert, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for appellants in No. 77-2222 and cross-appellees in No. 77-2444.
 David W. Marston, U. S. Atty., Walter S. Batty, Jr., Chief, App. Section, Robert N. Deluca, Chief, Civ. Div., Philadelphia, Pa., for Joseph A. Califano, Jr., appellee in No. 77-2222 and appellant in No. 77-2444; Stephanie W. Naidoff, Regional Atty., Margaret M. Hathaway, Asst. Regional Atty., Dept. of Health, Ed. and Welfare, Philadelphia, Pa., of counsel.Argued Jan. 4, 1978.
 Before SEITZ, Chief Judge, and GIBBONS and GARTH, Circuit Judges.
 Resubmitted In Banc July 10, 1978.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH and HIGGINBOTHAM, Circuit Judges.
 
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 
 1
 ALDISERT, Circuit Judge, with whom GIBBONS, WEIS and HIGGINBOTHAM, Circuit Judges, join.
 
 
 2
 Appellants in No. 77-2222, a proposed class action which was consolidated with Town Court Nursing Center, Inc. v. Beal, decided today, 586 F.2d 266 (3d Cir. 1978), are six residents at the Town Court Nursing Center who contend that their due process and statutory rights would be violated by termination of Medicaid funding to the nursing home without a pre-termination hearing. Because the district court made no class-action determinations, we treat this as the appeal of the named patients only. They have appealed from an order of the district court denying their motion to extend portions of a preliminary injunction entered during an earlier phase of the litigation.
 
 
 3
 They had requested a preliminary and permanent injunction to prevent the defendants, "prior to a final determination of all appeals by Town Court Nursing Center, Inc.," from (a) terminating Town Court's Medicare and Medicaid certification; (b) removing eligible patients from Town Court; (c) discontinuing or withholding reimbursement for the care of Medicare and Medicaid patients; and (d) prohibiting future placement of other Medicaid-eligible patients at Town Court.
 
 
 4
 The district court issued a temporary restraining order on July 21, 1977, enjoining the defendants from discontinuing or withholding reimbursement for care provided to eligible patients, pending reconsideration by HEW of a preliminary decision to terminate Town Court's provider status. Following a hearing, the district court granted the preliminary injunction sought by plaintiffs. The injunction by its terms was to remain in effect pending completion of the HEW reconsideration process, and until five days after the defendants gave plaintiffs written notice of their intention again to terminate Town Court's provider status. After HEW officials notified Town Court that they had affirmed the initial decision to terminate its Medicare provider status, Town Court and the six individually-named appellants sought an order extending the preliminary injunction pending an evidentiary hearing and full judicial review. A hearing on this motion was held on September 15, 1977, after which the district court denied plaintiffs' motion to extend those parts of the preliminary injunction that enjoined removal of patients and that enjoined defendants from prohibiting the placement of new patients. We granted an injunction pending appeal that continued in effect those portions of the preliminary injunction that the district court had refused to extend.
 
 
 5
 Appellants first allege that they will suffer a de facto loss of Medicaid benefits without the protection of a prior hearing if they are subjected to the physiological and psychological harm caused by transfer from Town Court. Second, they believe they have a protected property interest in continued occupancy at Town Court so long as Town Court remains in compliance with the applicable statutes and regulations. Consequently, they say that it was an infringement of these interests not to provide an evidentiary hearing and to allow for judicial review prior to decertification of the nursing center and prior to the de facto terminations of their "rights."
 
 In another case decided today we held that
 
 6
 (b)ecause a decision to decertify a nursing home as an unqualified provider is tantamount to an order to transfer a patient for his welfare, Medicaid residents threatened with transfer are entitled to some form of hearing on the existence of the condition or cause for transfer whether the home is a qualified provider and whether decertification is for the patients' welfare.
 
 
 7
 Klein v. Califano, 586 F.2d 250, 258 (3d Cir. 1978). We believe the holding in Klein to be controlling as to the issues raised by these appellants. We therefore remand this cause to the district court for a determination of what procedures will satisfy the constitutional rights of appellants prior to decertification of Town Court Nursing Center and for further proceedings consistent with Town Court, supra, and Klein, supra.
 
 
 8
 In No. 77-2444, Secretary of the Department of Health, Education and Welfare Califano has cross-appealed from that portion of the district court order which required that he "not withhold payments (from Town Court Nursing Center) for services actually provided to patients." Town Court Nursing Center, Inc. v. Beal, No. 77-2474 (E.D.Pa., Sept. 15, 1977) (order extending preliminary injunction in part and dissolving preliminary injunction in part). Because Medicaid certification and funding is so inextricably interrelated with federal administrative action through HEW, See Town Court, supra, 586 F.2d at 268-271, and in view of our holding that the residents of the nursing center have a right to a pre-termination hearing, that portion of the order from which Secretary Califano appeals will be affirmed.
 
 
 9
 The judgment of the district court in appeal No. 77-2222 will be vacated and the cause remanded for further proceedings consistent with Town Court, supra, and Klein, supra. Costs taxed against appellees.
 
 
 10
 The judgment of the district court in appeal No. 77-2444 will be affirmed.
 
 
 11
 ADAMS, Circuit Judge, with whom GIBBONS, WEIS and GARTH, Circuit Judges, join, concurring.
 
 
 12
 In recent years the government has become increasingly involved in satisfying the medical needs of its citizens, and the Medicare[1] and Medicaid[2] programs form an integral part of this development. They represent congressional enactments for the benefit of the aged and poverty-stricken sick, those on the fringe of society. This legislation has placed the recipient in a dependent position in relationship to government, and created a situation where the recipient expects to receive the privileges which Congress has voted to provide.
 
 
 13
 Due process, which secures legitimate property interests from arbitrary government intrusion, protects many of the expectations that flow from such dependent relationship by requiring that government accord affected individuals the process that is due them before it takes a contemplated course of action that may deny such individuals the benefits they anticipate. But the imposition of due process procedures as a predicate to government action can result in reduced efficiency of government operations and the availability of fewer funds for the intended beneficiaries. Concern has been expressed that unless the procedures made available to affected individuals are carefully fashioned, their societal cost would outweigh their benefit.[3]
 
 
 14
 In this case, the full Court is called upon to determine whether patients whose nursing home is about to be decertified as a qualified institution under the Medicare and Medicaid programs have any due process rights, and if so, the extent of such rights. The factual and procedural background of the controversy as well as the relevant statutory and regulatory provisions are set forth in the various opinions in the companion cases, Town Court Nursing Center, Inc. v. Beal, No. 77-2221, 586 F.2d 266 (3d Cir., 1978), and Klein v. Califano, No. 77-1896, 586 F.2d 250 (3d Cir., 1978). The appeal in this specific proceeding has been brought by six residents of Town Court Nursing Center who contend that their due process and statutory rights would be violated if they are not given an opportunity for a hearing before Medicare and Medicaid funding to the nursing home is terminated. In opposition, HEW and the Pennsylvania Department of Public Welfare maintain that since termination of a facility's eligibility for Medicare and Medicaid funding does not affect the patient's entitlement to reimbursement for medical care, the patients have not been deprived of any constitutionally protected property right by the decision to terminate.
 
 
 15
 The opinion announcing the judgment of the Court relies on the decision filed today in Klein v. Califano, No. 77-1896, 586 F.2d 250 (3d Cir. 1978), to conclude that the Medicare and Medicaid laws and regulations grant patients a protectible property right to continued residency at the home of their choice absent specific cause for transfer, and that consequently due process requires that they be given an opportunity for a hearing before decertification of their facility. I concur in that determination, but believe it appropriate to set forth some additional thoughts so as to clarify further this position in view of Chief Judge Seitz's dissent.
 
 
 16
 Moreover, there has been no discussion of the procedures to which the patients are entitled under due process. In Klein, the procedural posture in which the issue was presented rendered moot any discussion of precisely what process was constitutionally mandated. Accordingly, the Court in that appeal stated, "We pretermit the issue of how extensive is the process due patients, such as the plaintiffs here, until a case presents us with a continuing live dispute." Id. at 261. It seems to me that Town Court Is such a controversy. Nonetheless, the opinion announcing the judgment of the Court chooses not to discuss the issue, but rather to "remand this cause to the district court for a determination of what procedures will satisfy the constitutional rights of appellants prior to decertification of Town Court Nursing Center and for further proceedings consistent with Town Court, supra, and Klein, supra." Opinion by Judge Aldisert at 283. Since I believe that in a situation such as this, an appellate court has the obligation to furnish guidance to the district court that may be utilized on remand,[4] this opinion shall also address the problem of what process is due the patients.
 
 I.
 
 17
 An overriding consideration that a court must take into account when it confronts a procedural due process issue is the balance that is to be struck between fairness to the individual and effective government. On the one hand, the concept of due process embodies the law's fundamental respect for the dignity of the individual and its concern to shield him from the arbitrary whims of a government that overwhelms him both in size and power. On the other hand, government could be paralyzed if it were required to afford individuals who will be adversely affected by its decisions lengthy procedural safeguards before it may implement such decisions. The Supreme Court has prudently instructed that these competing values be resolved by a two-step analysis.[5] First, it must be ascertained whether the private party has a constitutionally cognizable life, liberty or property right which is threatened by the government action. An open-minded approach towards recognizing such rights enables the law to afford individuals the protection that due process envisions in the divers situations in which they are affected by government decisions. Second, the precise protective procedure to which the private party is entitled before he is deprived of his right must be determined. Only at this second step should practical countervailing interests be taken into account to formulate procedures that are responsive to the interests of both the government and the private party. Such methodology, I believe, should control the treatment of the present case.
 
 A.
 
 18
 A survey of the history of due process reveals a steady expansion in protected rights.[6] In large measure the source of this trend lies in the recognition that the distinction between those rights which a private party can claim against the government and those benefits to which he merely has a government-granted privilege is untenable in a society where individuals are becoming ever more dependent on government "privileges" for their very subsistence.[7] The fundamental concept undergirding due process that an individual not be stripped of his dignity by being subject to the arbitrary whims of government applies with equal force to privileges as to rights. Thus, it is now accepted doctrine that whenever an individual has a "legitimate claim of entitlement" that stems from state or federal law, regulation or practice, he may not be deprived of it without due process.[8]
 
 
 19
 The majority in Klein relies on three aspects of the Medicaid scheme[9] to establish as an initial proposition that a resident of a nursing home has "a legitimate entitlement to continued residency at the home of (his or her) choice absent specific cause for transfer."[10] First, reference is made to those provisions that guarantee that a person eligible for medical assistance under Medicaid may obtain medical services from any institution qualified under the federal program to perform such services.[11] Next, the opinion cites the regulations that ensure notice and a hearing to a recipient "who is aggrieved by an agency action resulting in suspension, reduction, discontinuance or termination of assistance."[12] Finally, the majority invokes the provision which states that a resident may be "transferred or discharged only for medical reasons or for his welfare or that of other patients, or for nonpayment for his stay."[13] After inferring a property right from these clauses, the Court in Klein posits that "a decision to decertify a nursing home as an unqualified provider is tantamount to an order to transfer a patient for his welfare,"[14] and consequently concludes that "Medicaid residents threatened with transfer are entitled to some form of hearing on the existence of the condition or cause for transfer whether the home is a qualified provider and whether decertification is for the patients' welfare."[15]
 
 
 20
 In his dissent in this case, Chief Judge Seitz takes issue with the Klein majority regarding its premises and its conclusion. He finds unpersuasive any inference from the Medicaid plan of a property right that nursing home residents may assert in opposition to decertification of such facility. He notes that the first provision cited by the majority guarantees only that a recipient have the right to choose among Qualified institutions; that the second provision ensures notice and a hearing only before termination or reduction in benefits, not before transfer from an unqualified facility; and that the third provision imposes upon the medical facility a standard of conduct with regard to transfer and discharge of individual residents and does not create any rights in the residents vis-a-vis HEW.[16]
 
 
 21
 This attempt by the dissent carefully to delimit the scope of the property right created by the three provisions, I believe, misses the thrust of the regulations and tends to trivialize the majority's approach in inferring a basis for the right to due process. Surely the majority does not intend to ground the property rights of the residents of Town Court on the regulation that requires notice and a hearing for the recipient prior to termination or discontinuance of Medicaid benefits. Similarly, the majority undoubtedly acknowledges that the provision that places limitations upon transfer or discharge is addressed only to the facility, not to HEW. However, when conjoined with the grant of freedom to choose among any qualified institutions, these regulations paint three distinct points in the landscape of a "legitimate claim of entitlement" that Medicaid beneficiaries can assert. Taken alone, the interest created by each of these clauses might be dismissed as not rising to the level of a cognizable property interest. However, when viewed together, they compel the conclusion that they identify three aspects of an "underlying substantive interest"[17] that enjoys the stature of "property."
 
 
 22
 What are the identifiable contours of this property right? First, it is evident that every Medicaid recipient has a protected right to uninterrupted receipt of benefits under the program. He or she may not be deprived of these payments without prior notice and an evidentiary hearing. Second, the regulations allow an elderly, infirm individual who seeks nursing home treatment freedom of choice in selecting the home of his or her preference so long as that home has qualified under the Medicaid program. Once confined in the home, the resident has a right to remain there, and may be moved only under specific circumstances. The facility itself may transfer or discharge a resident "only for medical reasons or for his welfare or that of other patients, or for nonpayment for his stay."[18] The regulations do not explicitly specify any circumstances under which HEW may cause the removal of a resident from his chosen facility. However, at least two such situations are inherent in the regulatory scheme. HEW may instigate a resident's removal by terminating his benefits. Also, HEW may precipitate a resident's transfer to another home by decertifying the facility at which he presently resides, inasmuch as the regulation ensures only the freedom to choose among qualified institutions. This last aspect of the property right is implicated in Klein and Town Court.
 
 
 23
 The Supreme Court has repeatedly stated that "some kind of hearing is required at some time before a person is finally deprived of his property interest." Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 16, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), Quoting Wolff v. McDonnell, 418 U.S. 539, 557-58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). See also Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Inasmuch as the regulatory scheme invests each resident with a right to remain at the facility of his choosing so long as it qualifies under the plan, the decision to decertify the institution necessarily effects a deprivation of this right and entitles the resident to due process procedures.[19]
 
 
 24
 I agree with the dissent as must my other colleagues that nursing home residents have no right to choose or to remain in a non-qualified facility. But that begs the question, at least in the instant case. For this limitation on the residents' property right perforce has no bearing on the issue whether residents of a Presently qualified facility as were the Town Court residents at the time in question must be given the opportunity to participate in deliberations that may lead to the facility's decertification. The continued existence of the residents' constitutionally protected property right to remain in the home of their choice hinges on whether the facility is qualified. And the residents here are seeking to present information touching on that issue. Consequently, due process mandates that before they are deprived of their right, the affected individuals be afforded the opportunity to be heard on the material factual issue of the home's qualification.[20]
 
 
 25
 In addition to disputing the existence of a property right, the dissent makes a number of arguments to support its contention that there is nothing "harsh or unrealistic about the scope of present statutory and administrative procedures governing decertification."[21] First, the dissent attempts to distinguish the Town Court situation from the circumstances presented in the Supreme Court cases employed by the majority[22] on the ground that decertification of an institution does not terminate or otherwise prejudice the rights of the residents to receive Medicaid benefits so long as they live in another, qualified facility. This distinction appears to be beside the point. Just as the right to Medicaid benefits is cognizable under due process, so too is the right to remain at the qualified facility of one's choice, and This right Would be prejudiced by decertification of the facility.
 
 
 26
 Second, the dissent points out that since the institution has a vested interest in preserving its status under the Medicaid plan, it can be expected to adduce the best case for continued certification. And, the dissent continues, the institution is in the position to correct deficiencies and thus avoid termination. While these observations appear to be correct, they cannot obviate the need under due process to afford residents the opportunity to present Their perceptions and perspectives on the issue of decertification. It seems to me to be a proposition fraught with danger and indeed incorrect as a matter of due process analysis to curtail the legitimate property rights of the residents simply because the residents are funded indirectly through payments to the nursing home, thus creating a property right in the institution as well. Rather, due process protections must be accorded equally to the "legitimate claims of entitlement" of the residents and to the institution.
 
 
 27
 Third, the dissent suggests that the administrative procedures currently in existence adequately protect the interests of the residents. Chief Judge Seitz specifically takes judicial notice of a Pennsylvania Department of Health manual[23] which states that the required on-site pre-decertification survey "generally involves" interviews with residents,[24] and notes that the survey team consists of highly trained professionals. He also remarks that senile and incompetent residents would often be unable to participate in a due process hearing. Finally, the dissent raises the specter of administrative and judicial delays if residents are afforded participation rights "in all surveys and, presumably, in judicial review of their sufficiency."[25] Since these contentions appear logically to be directed to the Type of due process procedure to which the residents are entitled, they are best treated in that context.
 
 
 28
 In sum, the Medicare and Medicaid programs appear to establish a "legitimate claim of entitlement" which must be accorded due process protection. However, even if a court were to conclude that the governing provisions do not on their face create such a property right, it would be required to construe them in a manner that fairly accords with the circumstances of the parties and with the underlying purpose of the due process clause. I believe that the result reached by a majority of this Court comports with that mandate. It would be difficult to contend that nursing home patients do not have a strong interest in avoiding unnecessary transfers. Many of them have been uprooted from the communities in which they spent their working lives. For most of these patients, the limited world of the nursing home is the only community in which they retain a stable network of personal and social relationships. In addition, invalids and prospective invalids alike have a strong interest in avoiding the unnecessary physical hardship that could result from a mistaken transfer. These "home" and "health" interests, I submit, are among those that most persons would regard as being encompassed by the protections of the due process clause.
 
 
 29
 Also, we may take judicial notice of the fact that the plaintiff patients in these cases are physically weakened, economically disadvantaged, and often without significant contact with or control over the "outside community." Economic need and physical incapacity appear to have forced them to seek support from the government. They thus are members of a class of persons to whom the enforcement of essential procedural protections through a non-majoritarian branch of the government is of special importance.[26] For us to construe the controlling provisions strictly against the patients in such circumstances would seem to violate elementary notions of fairness.
 
 
 30
 These practical factors, to my mind, are relevant and persuasive on the issue of whether the statute and regulations should be interpreted to create a protected property interest in this case. The majority's reading of the statute fairly conforms to these underlying equitable concerns. Even if the dissent's strict construction were textually plausible, it is inconsistent with this more elemental understanding of the problem.
 
 
 31
 The kind of issue raised in this case is one that this Court will doubtless face again. Federal transfer payments, which are an enormous factor in total economic activity, have resulted in all sorts of new quasi-contractual relationships. They have thereby transformed, for millions of persons, the very nature of property. An occupant of a nursing home, for example, will in many cases have no property interest other than the expectation of occupying a familiar room and seeing familiar faces. Because that expectation does not fit into a conventional legal pigeonhole like a leasehold for a term or a tenure of employment, many judges may be uncomfortable with the thought of affording it appropriate due process protection. But there is, it seems to me, more rather than less need for the recognition of minimum due process protections for the new forms of property that arise out of the increasing role of government in transfers of the fruits of the economy. We should be alert for and receptive to claims for due process protection of such property, and where the terms of the authorizing rules permit, we should be prepared to take a practical rather than a technical approach to such claims, whenever it is necessary to protect the dignity and autonomy of those who participate in wealth transfer programs.
 
 B.
 
 32
 Once it is determined that the government is constrained from taking a particular action affecting private parties without according them due process of law, it is essential to ascertain what process is due. The principle that governs this second phase of the due process inquiry is to be contrasted with the inclusive approach towards identifying the rights that are entitled to due process protection. As the Supreme Court has instructed, "(d)ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976), Quoting Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 34 L.Ed.2d 484 (1972).[27] Thus, practical considerations play a prominent role in fashioning the procedural safeguards that will implement the fundamental due process concern of preventing officials from arbitrarily interfering with private endeavors. The practical considerations reflect the recognition that the government must be able to function efficiently and expeditiously and that if scarce public resources are to be used optimally, the government cannot be unduly fettered in administering its programs by costly and time consuming bureaucratic procedures.[28] Therefore, in assessing what procedural safeguards are necessary before government may deprive a private party of a constitutionally protected interest, courts should be careful to require only the minimal protections mandated by due process, leaving the other branches of government free to determine the extent of the procedural protective mechanisms that will be authorized.[29] The constitutionality of a chosen scheme should be upheld if it permits the aggrieved party to air his views in such a manner that the risk of an erroneous determination by the government is reduced and the value of other, more burdensome procedures is outweighed by the cost and delay that they would entail.
 
 
 33
 This flexible framework for analyzing what procedural safeguards are mandated by due process has been clearly articulated in Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):
 
 
 34
 (R)esolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. Arnett v. Kennedy, Supra (416 U.S. 134), at 167-168, 94 S.Ct. 1633 (Powell, J., concurring in part); Goldberg v. Kelly (397 U.S. 254), at 263-266, 90 S.Ct. 1011; Cafeteria Workers v. McElroy (367 U.S. 886), at 895, 81 S.Ct. 1743. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See. E. g., Goldberg v. Kelly, Supra (397 U.S. 254), at 263-271, 90 S.Ct. 1011.
 
 
 35
 When balancing the governmental and private interests to arrive at the process that is due, only once has the Supreme Court insisted on a full evidentiary hearing before the government decision in question became effective.[30] The Court in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), held unconstitutional a procedure which provided for written submissions by the welfare recipient but no hearing before payments were cut off. In requiring that the welfare recipient be afforded a pre-termination full evidentiary hearing at which he can appear personally, offer oral evidence and confront witnesses, Goldberg recognized that
 
 
 36
 "the crucial factor in this context . . . is that termination of aid pending resolution of a controversy over eligibility may deprive an Eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. This need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy."
 
 
 37
 Id. at 264, 90 S.Ct. at 1018 (emphasis in original). The Court concluded that "the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the state's competing concern to prevent any increase in its fiscal and administrative burdens." Id. at 266, 90 S.Ct. at 1019.
 
 
 38
 In other cases before the Supreme Court, due process has been found to be satisfied by administrative procedures that did not include a full evidentiary hearing before the deprivation. Thus, where a private party sought to garnish property, the Court held that due process requirements were met if the garnishing party was required to initiate an Ex parte proceeding before a neutral officer, supply an affidavit supporting his claim to the property, and post a bond, provided that the aggrieved party is given an opportunity to contest the seizure promptly thereafter. Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Also, in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Court upheld the administrative procedures for dismissing a federal employee for cause, which included a copy of the charge and an opportunity to file a written response and to make an oral appearance before the dismissal, with an evidentiary proceeding only thereafter. Just last term the Supreme Court found that an informal administrative remedy whereby a customer whose municipal utility service was to be cut off for nonpayment of bills would be permitted to meet with "a responsible employee empowered to resolve the dispute" was sufficient to satisfy the dictates of due process. Memphis Light, Gas and Water Division v. Craft, 436 U.S. 1, 18, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978).
 
 
 39
 Of the recent Supreme Court pronouncements regarding the process that is due in various situations, Mathews v. Eldridge[31] is most instructive for determining what protections must be accorded the patients in the instant case. In Eldridge the Supreme Court was faced with whether due process required that a recipient of Social Security disability payments be afforded an opportunity for an evidentiary hearing before his benefits were terminated. After carefully balancing the private[32] and public[33] interests as they were manifested in the situation before it and evaluating the fairness and reliability of the existing pretermination procedures,[34] the Court found that the elaborate administrative mechanism provided by the Social Security Administration[35] satisfied the mandate of due process, and that a full evidentiary hearing was not required. Noteworthy is the admonition with which the Court concluded its opinion:
 
 
 40
 (T)he judicial model of an evidentiary hearing is neither a required, nor even the most effective method of decisionmaking in all circumstances. . . . All that is necessary is that the procedures be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," Goldberg v. Kelly, 397 U.S. (254), at 268-269, 90 S.Ct. 1011 (footnote omitted), to insure that they are given a meaningful opportunity to present their case. In assessing what process is due in this case, substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals. See Arnett v. Kennedy, 416 U.S. (134), at 202, 94 S.Ct. 1633 (White, J., concurring in part and dissenting in part).
 
 
 41
 424 U.S. at 348-49, 96 S.Ct. at 909.
 
 
 42
 It is evident, in view of Eldridge, that the Town Court residents need not be afforded an evidentiary hearing before the decision to decertify the facility becomes final. Eldridge emphasized that the critical element that underlay Goldberg's requirement of a pre-termination evidentiary hearing was that without welfare benefits the recipient was left destitute, and would in all likelihood be unable to pursue his administrative remedies. This factor was found lacking in Eldridge,[36] and is also absent from the situation in Town Court, where the patients will continue to receive Medicaid assistance after their transfer to other facilities. Consequently, no justification would seem to exist here for departing from the general rule that due process is satisfied by "something less than an evidentiary hearing,"[37] as long as the selected procedures "assure fair consideration of the entitlement claims of individuals."[38]
 
 
 43
 In determining what process is due the Town Court residents, it is helpful to place in perspective the purpose that will be served by such procedures. Obviously, the facility's residents cannot be expected to play a primary role in the decision to decertify. As the dissent points out, the main burden for presenting the case in support of continued certification must rest with the institution itself, since it has the greatest financial interest at stake and is in the better position to adduce relevant facts and to correct violations. Still, the facility's residents have a two-fold, unique interest that should be accommodated by the due process-mandated procedures.
 
 
 44
 First, the residents have a legitimate claim that they be permitted to supplement any data gathered from other investigative sources regarding the issue whether the facility qualifies under federal and state standards. On the basis of their first-hand experiences the residents can provide relevant information which cannot be obtained from other sources concerning the daily functioning of the institution as it affects them.[39]
 
 
 45
 Second, the residents should be allowed to bring to light other factors that ought to be weighed before a facility is decertified and its Medicare and Medicaid patients moved elsewhere. The distinction between qualified and unqualified homes is not marked by a bright line. Rather, an institution is decertified when, in the judgment of the federal and state administrators charged with reviewing its performance, it is not in "substantial compliance" with applicable standards and is unlikely to correct its violations.[40] As the Town Court proceedings indicate, a facility may technically be in noncompliance with the standards for a period of years before it is finally decertified.[41] In view of the discretionary nature of a decision to decertify an institution, it seems reasonable to conclude that where the patient transfer that inevitably accompanies decertification would result in serious hardship or danger to the patients, the administrators probably would be reluctant to decertify the institution and would seek instead to alleviate the nonconforming conditions through alternative sanctions. For instance, if it were brought to the administrators' attention that ten patients were in an intensive care unit recovering from recent heart attacks and that moving them would endanger their lives, the decisionmakers might decide to maintain the institution's certification on a temporary basis. The residents are entitled to an opportunity to present factors such as these which affect their right to remain at the qualified institution of their choice.
 
 
 46
 Besides the usual interests in reducing administrative burdens and other social costs, the government's interests in many ways complement those of the patients. Of prime concern to the government is the patients' well-being.[42] To this end the statutory scheme requires periodic inspections and evaluations of the facility.[43] Also, the patients' welfare necessitates expeditious action to close down facilities with dangerous conditions.
 
 
 47
 With this assessment of the interests of the patients and the government, the precise process that is due residents of an institution prior to decertification may now be outlined. The interests of the patients and the government can optimally be served by informal and flexibly-structured procedures whose purpose would be to permit the patients to provide relevant information on a decision that will have a major effect on their lives before that decision is made, while not unduly delaying or complicating the administrative process.
 
 
 48
 Since the patients are clustered at the facility and the information sought is within their knowledge, their participation could be solicited upon short notice. In fact, the procedure by which data is obtained from them could easily be incorporated into the present apparatus for investigating and surveying the institution.[44] As part of the numerous surveys that are conducted at the institution prior to decertification, the government representative should therefore assemble the residents of the facility for an informal opportunity to express their views. At such occasion the government representative should explain the contemplated action, the reasons for it, and its potential effect on the patients. Then the patients should be asked to comment. This gathering should be supplemented with individual interviews with those patients who did not attend, since the reasons which prevented them from attending may also justify a determination that they should not be transferred. To ensure the greatest degree of input and to accommodate the needs of the various residents, they should be given the opportunity to present material both orally and in writing, and be offered assistance in formulating their responses.[45]
 
 
 49
 The fact that many residents are physically or mentally too infirm to take advantage of any procedural machinery that would be established is an inadequate reason for not setting up a mechanism that will meaningfully represent their constitutionally-protected interests. If a patient is too sick to participate, he may be too sick to be transferred, and the investigators should be required to look into that possibility. Also, the needs of these unfortunate individuals can be presented by relatives, friends, or other representatives, who should be notified of such opportunity.
 
 
 50
 Carefully circumscribed procedures as previously suggested for protecting the rights of nursing home residents who receive benefits under the Medicaid program in remaining at the qualified institution of their choice, at least until it has been determined to be unqualified, would appear appropriate. The limited participation afforded by such an arrangement would not unduly impede the government's ability to take decisive and prompt action to ensure the welfare of the patients. It would not constrict the freedom of the other branches of the government by requiring the establishment of bureaucratic machinery or necessitating costly expenditures. Moreover, it would not be required at the annual survey of the facility but only in the infrequent event that decertification of the facility is proposed, since only in that event do the regulations invest the residents with a protectible property right. Finally, it would not clog the courts, because patients who are transferred to a different facility as a result of a procedurally fair determination to decertify the institution at which they resided rarely will have any reason to question the administrative decision in a post-decertification court battle. Nevertheless, granting the patients this limited opportunity to air their concerns sufficiently reduces the risk of an erroneous deprivation of the rights of those who potentially are affected most seriously by the decision to constitute the process that is due them.
 
 CONCLUSION
 
 51
 As often occurs in cases involving constitutional issues, the factual situation presented in Town Court may not be a particularly appealing one for expounding constitutional protections. The nursing home has a history of noncompliance with the governing regulations. It has been subject to a number of extensive investigations and had been afforded opportunities to correct deficiencies before it was finally decertified. Nonetheless, when a court is adjudicating constitutional principles, its view should not be obscured by the fact that one or the other litigant does not measure up to a particular standard. Although the government's decertification decision may eventually be proven to be correct, that is not the point at issue in the patients' appeal. Rather, we have been asked to address the limited questions whether the governing regulations secure the right to residents of a facility presently qualified under Medicare and Medicaid to be heard before the facility is decertified, and if so, the extent of this right. I believe that in recognizing in the patients a right to participate while carefully limiting its content, an approach has been suggested that both enhances the values of due process and is practical in its application.
 
 
 52
 SEITZ, Chief Judge, dissenting.
 
 
 53
 Judge Aldisert's opinion relies on the majority opinion filed today in Klein v. Califano, No. 77-1896, 586 F.2d 250 (3d Cir. 1978). In this dissent, therefore, I primarily address the reasoning in Klein, With some reference to the concurring opinion herein.
 
 
 54
 Klein holds that due process requires that residents of an intermediate health care facility be given an opportunity for a hearing before decertification of that facility. Initially, the Klein Majority postulates that HEW's regulations grant residents a "property right" not to be transferred without cause. As its minor premise, the majority asserts that an initial administrative decision to decertify an institution is tantamount to an order to transfer. We are to deduce, then, that Medicaid residents are constitutionally entitled to an opportunity to participate in the proceedings that may lead to an initial decertification. I cannot agree either with the majority's premises or with its conclusion.
 
 
 55
 The majority recognizes, as it must, that due process would place procedural constraints on HEW only if the residents' interests in continued occupancy enjoy the stature of "property." An independent source, here the Medicaid law and regulations, must create the "underlying substantive interest" that is to be accorded this stature; federal constitutional law then determines whether that interest "rises to the level of a 'legitimate claim of entitlement' protected by due process." Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978).
 
 
 56
 The majority finds that continued residency in the nursing home of one's choice absent specific cause for transfer is an underlying substantive interest created by three Medicaid provisions. Under the first, 42 U.S.C. § 1396a(a) (23), a Medicaid recipient may obtain medical care "from any institution . . . qualified to perform the service or services required." Clearly, what the majority characterizes as a recipient's right to obtain medical care from a "freely selected provider" is limited to a choice among institutions which have been determined by the Secretary to be "qualified." Next, the majority's reliance on 45 C.F.R. § 205.10(a)(5), ensuring a notice and hearing to a recipient whose benefits are suspended, reduced, discontinued or terminated, is obviously misplaced. As the majority itself notes, the decertification of these facilities did not reduce or suspend the residents' rights to continued benefits.
 
 
 57
 Finally, the majority relies upon 45 C.F.R. § 249.12(a)(1)(ii)(B)(4),[1] which establishes as one requirement for an institution's certification that each resident admitted to that institution be "transferred or discharged only for medical reasons or for his welfare or that of other patients, or for nonpayment for his stay." The majority reads this provision as a limitation on the Secretary's power to interrupt a recipient's residence at a particular institution. Clearly, however, this provision is a standard of conduct imposed by the Secretary upon the provider. Violation of this standard is one of many grounds for decertifying the offending institution. See 45 C.F.R. §§ 249.33(a) (2), 249.10(b)(15). The provision creates no "substantive interest" in the residents vis-a-vis the Secretary.
 
 
 58
 Moving to its minor premise, the majority postulates that a decision to decertify is tantamount to a decision to transfer individual residents. Practically, of course, this may be a consequence in most cases, at least where an institution fails to remedy its insufficiencies. Analytically, however, the two decisions are different. Decertification focuses on the institution's noncompliance with HEW's standards. The majority does not and cannot contend that recipients have a right to remain in an institution that the Secretary has found, by appropriate procedures, to be in substantial noncompliance with the standards. "Transfer trauma," although a legitimate concern for some residents, is necessarily subordinate to the threat posed to all residents by substandard conditions.
 
 
 59
 Thus, a careful reading of the provisions cited by the majority reveals that neither statutes nor regulations grant the residents of an intermediate health care facility a "substantive interest" in decertification proceedings brought by the Secretary; hence, the residents have no constitutionally protected property right in uninterrupted occupancy.
 
 
 60
 The concurring opinion in this case concedes that "(t)aken alone, the interest created by each of (these provisions) might be dismissed as not rising to the level of a cognizable property interest." Nonetheless, we are asked to agglomerate these "three distinct points" into a "landscape of a 'legitimate claim of entitlement.' " Each of the provisions governs an isolated and inapposite aspect of the program's administration. Their effect as a whole, then, cannot be greater than the sum of their parts. Nor is such infirmity rehabilitated by expressions of concern, in which I join, for the welfare of patients generally.
 
 
 61
 There is nothing harsh or unrealistic about the scope of present statutory and administrative procedures governing decertification. Significantly, a decertification of a non-complying facility does not terminate or otherwise prejudice the rights of the residents to continued Medicaid benefits. Their benefits will be paid so long as they reside in an intermediate health care facility that complies with federal standards. This important fact immediately distinguishes the cases, employed by the majority in Klein, in which the individual involved suffered possible direct prejudice to some substantive liberty or property interest.[2]
 
 
 62
 Furthermore, and of substantial significance, there is resident input in the survey that must precede an initial decertification. We may take judicial notice of a document entitled "Long Term Care Facilities Surveyor's Orientation Manual" published in September 1976 by the Pennsylvania Department of Health. On pages III 8-9 of the Manual, in a section entitled "Survey Methodology," the Manual notes that an on-site survey "generally involves" interviews with residents. On page III-7 the Manual suggests that the surveyor at times may have to assume the role of "patient advocate."
 
 
 63
 A nursing home is not even initially terminated until elaborate proceedings conducted by professionals have resulted in a determination that the institution is not complying substantially with the provisions of its agreement with the Secretary. Here, the survey team consisted of two registered nurses, a dietician, and an equal opportunity development specialist. See Town Court v. Beal, No. 77-2221, 586 F.2d 266 (3d Cir. 1978).
 
 
 64
 While the Medicaid program itself has been enacted for the benefit of the residents, the survey proceedings are necessarily concerned with the applicable conditions of participation as set forth in the regulations. One should not lose sight of the fact, however, that the ongoing monitoring of participating health care facilities is primarily designed to protect the health and safety of the residents.
 
 
 65
 In many cases residents would not be in physical or medical condition to participate even minimally in a decertification hearing. Indeed, it is not clear what duties the majority in Klein would impose upon the Secretary where senile or incompetent residents are incapable of representing their own interests. Furthermore, since all such facilities must be surveyed annually, it is evident that the majority's position would require that residents be afforded "due process" rights in all surveys and, presumably, in judicial review of their sufficiency.
 
 
 66
 The provider, of course, has a vested interest in "defending" his institution during any survey and so may be expected to adduce the best case for continued certification. Furthermore, he is the one who can correct deficiencies and thus avoid a termination.
 
 
 67
 Both the law and the facts dictate the conclusion that the mandated initial termination procedures do not deprive these residents of due process.
 
 
 68
 I would affirm the order of the district court refusing to extend portions of the preliminary injunction (No. 77-2222) and I would reverse the order of the district court continuing in effect part of the preliminary injunction (No. 77-2444).
 
 
 69
 ROSENN and JAMES HUNTER, III, Circuit Judges, join in this dissent.
 
 
 
 [1]
 42 U.S.C. § 1395 et seq. and implementing regulations
 
 
 [2]
 42 U.S.C. § 1396 et seq. and implementing regulations
 
 
 [3]
 E. g., Friendly, Some Kind of Hearing, 123 U.Pa.L.Rev. 1267, 1276 (1975)
 
 
 [4]
 See Geraghty v. United States Parole Commission, 579 F.2d 238, at 254 (3d Cir. 1978). Without such guidance there exists the possibility that this Court's energies will be taxed unnecessarily by yet another appeal, and that the trial court may be required to duplicate its effort as well
 
 
 [5]
 See Memphis Light, Gas and Water Division v. Craft, 436 U.S. 1, 7, 12, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); Arnett v. Kennedy, 416 U.S. 134, 167, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part); Id. at 177, 186, 94 S.Ct. at 1655, 1660 (White, J., concurring in part and dissenting in part); Id. at 207, 212, 94 S.Ct. at 1670, 1673 (Marshall, J., dissenting). For a historical sketch of the development of the two-step analysis, See L. Tribe, American Constitutional Law § 10-8 at 507-08; § 10-10 at 532-33 (1978)
 
 
 [6]
 See e. g., Memphis Light, Gas and Water Division v. Craft, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (U.S., May 1, 1978) (public utility service); Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (disability benefits under Social Security Act); Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (public high school education); Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("good time" credits towards a shortened jail sentence, and solitary confinement); Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (teacher's employment tenure at state university); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (conditional freedom following parole); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (state welfare benefits). But see cases cited in note 8 Infra
 
 
 [7]
 See, e. g., Board of Regents v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). For discussions of the erosion of the right-privilege distinction, see R. O'Neil, The Price of Dependency: Civil Liberties in the Welfare State (1970); Linde, Justice Douglas on Freedom in the Welfare State: Constitutional Rights in the Public Sector, 39 Wash.L.Rev. 4 (1964); Powell, The Right to Work for the State, 16 Colum.L.Rev. 99 (1916); Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439, 1445-49 (1968); Comment, Entitlement, Enjoyment, and Due Process of Law, 1974 Duke L.J. 89; Note, The Effect of Tenure on Public School Teachers' Substantive Constitutional and Procedural Due Process Rights, 38 Mo.L.Rev. 279, 281-87 (1973); Comment, Due Process and Public Employment in Perspective: Arbitrary Dismissals of Non-Civil Service Employees, 19 U.C.L.A.L.Rev. 1052 (1972)
 
 
 [8]
 Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In Roth the Supreme Court held that a teacher hired by a state university for a fixed term of one academic year did not possess a constitutionally protected interest in re-employment for the next year. Other cases that have dismissed claims of entitlement on the ground that in fact they merely expressed unilateral expectations that were not recognized by state or federal law include Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (transfer of prisoner to another state prison); Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (police flyer identifying individual as a "known" shoplifter); Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (police officer employment). The insistence in these cases that the "legitimate claim of entitlement" be identified only by reference to positive law has been criticized by commentators as manifesting too narrow and rigid a conception of the rights guaranteed by the Constitution and as being internally inconsistent. See L. Tribe, American Constitutional Law §§ 10-10 & 10-11 (1978); Monaghan, Of "Liberty" and "Property", 62 Cornell L.Rev. 405 (1977); Van Alstyne, Cracks in the "New Property": Adjudicative Due Process in the Administrative State, id. at 445; Tushnet, The Newer Property: Suggesting for The Revival of Substantive Due Process, 1975 Supreme Court Review 261; Comment, Entitlement, Enjoyment and Due Process of Law, 1974 Duke L.I. 89; Comment Two Views of a Prisoner's Right to Due Process: Meachum v. Fano, Harv.Civ.Rights Civ.Lib.L.Rev. 405 (1977); The Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 86-104 (1976). However, in determining whether there is a protected property interest in the situation before us, we are bound by the guidelines enunciated by the Supreme Court
 
 
 [9]
 In Klein, only termination of Medicaid reimbursements to the nursing home was at issue. In Town Court, on the other hand, HEW decertified the facility for Medicaid as well as for Medicare purposes. Nevertheless, Klein's Treatment of the Medicaid provisions is equally apposite to the Medicare aspect of the Town Court litigation since at least two of the provisions of the Medicaid program that were relied upon in Klein have their counterparts in the Medicare statute and regulations. See notes 11-13 Infra
 
 
 [10]
 Opinion at 258
 
 
 [11]
 42 U.S.C. § 1396a(a)(23); 45 C.F.R. § 249.20 (1976). The parallel provision in the Medicare scheme is 42 U.S.C. § 1395a
 
 
 [12]
 45 C.F.R. § 205.10(a)(5); Id. § (4)(i). The Medicare scheme guarantees similar procedural protections. 20 C.F.R. § 404.901 et seq. (1976); See id. at § 405.701
 
 
 [13]
 45 C.F.R. § 249.12(a)(1)(ii)(B)(4) (1976)
 
 
 [14]
 Opinion at 258
 
 
 [15]
 Id. (footnote omitted)
 
 
 [16]
 Opinion at 295
 
 
 [17]
 Memphis Light, Gas and Water Division v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978)
 
 
 [18]
 45 C.F.R. § 249.12(a)(1)(ii)(B)(4) (1976)
 
 
 [19]
 This conclusion is buttressed by the fact that the regulations already provide the patients with procedural safeguards in the two other situations where their removal from the facility of their choice is authorized, namely, when the facility seeks to transfer them, See note 13 and accompanying text Supra, and when HEW terminates their benefits, See note 12 and accompanying text Supra
 
 
 [20]
 This analysis rests solely on the limited property right established by the first provision cited by the Klein majority, 42 U.S.C. § 1396a(a)(23); 45 C.F.R. § 249.20 (1976). The other two provisions referred to in Klein merely shed light on Congress's intent to create a property interest in favor of nursing home residents to remain in the qualified home of their choice
 Accordingly, the interpretation proffered herein does not necessitate making the assertion made by the Klein majority that decertification of a facility is tantamount to a decision to transfer an individual resident. Nevertheless, the analysis here suggests the fallacy in the dissent's refutation of the majority's assertion. The dissent concedes that the practical effect of decertification in most cases is the forced transfer of residents, but maintains that an analytical distinction exists because decertification focuses on the facility's substantial noncompliance with HEW standards. Since residents have no right to remain in an unqualified institution, the dissent reasons, " 'transfer trauma' . . . is subordinate to the threat posed to all residents by substandard conditions." Opinion at 296. As pointed out in the text, however, the dissent assumes as a premise the factual issue which the residents seek to contest, namely, whether the institution is unqualified within the meaning of the statute.
 Obviously, inasmuch as the holding that residents of a nursing home who receive benefits under the Medicare or Medicaid programs are entitled to due process procedures before the home is decertified rests on this Court's construction of the governing regulations, the decision is limited to such patients. The rights of other patients such as those hospitalized for mental illness or retardation in state institutions is dependent upon the language and intent of the provisions controlling their confinement.
 
 
 [21]
 Opinion at 296
 
 
 [22]
 Memphis Light, Gas and Water Division v. Craft, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1974)
 
 
 [23]
 Pennsylvania Department of Health, Long Term Care Facilities Surveyor's Orientation Manual (September 1976)
 
 
 [24]
 Id. at III 8-9
 
 
 [25]
 Opinion at 297
 
 
 [26]
 See United States v. Carolene Products Co., 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)
 
 
 [27]
 See also Cafeteria and Restaurant Workers Local 473 v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 162-63, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)
 
 
 [28]
 See Mathews v. Eldridge, 424 U.S. 319, 347-48, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)
 
 
 [29]
 See Goldberg v. Kelly, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)
 
 
 [30]
 See Mathews v. Eldridge, 424 U.S. 319, 340, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)
 
 
 [31]
 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)
 
 
 [32]
 The Court determined that since the recipient is entitled to retroactive benefits if he ultimately prevails, his only interest is in the uninterrupted receipt of funds pending final disposition of his claim. 424 U.S. at 340, 96 S.Ct. 893
 
 
 [33]
 The Court mentioned "the incremental cost resulting from the increased number of hearings and the expense of providing benefits to ineligible recipients pending decision," and noted the strong interest of the public "in conserving scarce fiscal and administrative resources," particularly since "the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving. . . ." 424 U.S. at 347-48, 96 S.Ct. at 909
 
 
 [34]
 The Court focused on the fact that in most cases the validity of the disability claim hinges on the evaluation of easily documented routine and unbiased medical reports, and concluded that since credibility is rarely an issue the reports could be assessed upon written submissions, as provided in the existing procedures. This was found to create a decided distinction between Eldridge and Goldberg v. Kelly, Supra, in that oral presentation was deemed to be essential for a welfare recipient to communicate his case to the decisionmaker in view of the low educational level of most recipients. 424 U.S. at 343-45, 96 S.Ct. 893
 
 
 [35]
 Among other procedural safeguards, the administrative mechanism required the state agency which administered the program to evaluate periodically the recipient's continued eligibility. Its assessments were to be based on investigations performed by its own medical and nonmedical personnel as well as upon information which it solicited from those who treated the recipient and from a detailed questionnaire from the recipient himself. Upon reaching a tentative conclusion that benefits should be terminated, the agency was required to provide the recipient with a summary of the evidence upon which it based its assessment, to afford him an opportunity to review his file, and to permit him to respond in writing and submit additional evidence. After the state agency made its final determination, it was to be reviewed by an examiner in the Social Security Administration Bureau of Disability Insurance and accepted by the Administration. Benefits were to be terminated two months after the month in which medical recovery is found to have occurred. The recipient is given the right to have the termination reviewed by different levels in the state agency, the Administration, and finally, the federal courts. If he prevails to any degree the recipient is entitled to retroactive payments. 424 U.S. at 336-39, 96 S.Ct. 893
 
 
 [36]
 424 U.S. at 340-43, 96 S.Ct. 893
 
 
 [37]
 Mathews v. Eldridge, 424 U.S. 319, 343, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976)
 
 
 [38]
 Id. at 349, 96 S.Ct. at 909
 
 
 [39]
 As the lower court in Klein Aptly commented,
 While the court is deferential to the expertise of HEW, it is rank paternalism to suggest that patients who live in a facility, who have firsthand knowledge of the conditions, who are best equipped to describe how that facility has served them, cannot contribute to the process by which it is determined whether the facility meets federal standards. The court finds it hard to understand how HEW can seriously argue that the very patients whom HEW seeks to protect can have no purposeful role with respect to the condition of their environment.
 Klein v. Mathews, 430 F.Supp. 1005 (D. N.J., 1977), Remanded with instructions to dismiss as moot, No. 77-1896, 586 F.2d 250 (3d Cir. 1978).
 
 
 [40]
 42 U.S.C. § 1395cc(b)(2)
 
 
 [41]
 Thus, despite various deficiencies, Town Court was able to maintain its status as a qualified facility from the time of its certification in 1967 until October, 1974, because it was still in "substantial compliance" and because it continually submitted plans of correction. Town Court Nursing Center, Inc. v. Beal, No. 77-2221, 586 F.2d at 266 (3d Cir. 1978)
 
 
 [42]
 Cf. 45 C.F.R. § 249.12(a)(1)(ii)(B)(4) (1976) (regulation permits facility to transfer patients only, Inter alia, "for his welfare or that of other patients.")
 
 
 [43]
 45 C.F.R. § 250.23 (1976). The statute limits accreditation of a facility to twelve months, 42 U.S.C. § 1395cc(a)(1), thus necessitating annual surveys
 
 
 [44]
 45 C.F.R. § 250.23(a)(3)(v) (1976) specifically requires that the medical review team inspection include "personal contact with and observation of each patient receiving assistance under the plan by a team member or members, and review of each such patient's medical record." See also Text accompanying note 23 Supra (dissent takes judicial notice of Pennsylvania manual stating that on-site survey "generally involves" interviews with residents)
 
 
 [45]
 Allowing the patients this flexibility in choosing among alternative modes of communication appears to be mandated in light of the Supreme Court's discussion in Mathews v. Eldridge, see Note 34 Supra. Many of the elderly patients who reside in nursing homes may share with the welfare claimant in Goldberg v. Kelly the inability to communicate effectively in writing. Others may feel intimidated or embarrassed by their fellow residents' presence at the gathering and prefer not to disclose personal concerns. Still others may be both unable to communicate in writing and unwilling to speak in public, but would be willing to discuss their concerns in private interviews
 
 
 [1]
 45 C.F.R. § 249 (1976) has been recodified at 42 C.F.R. § 449 (1977). In conformity with the majority opinion all citations to that section will be to the earlier codification
 
 
 [2]
 Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)