609 F.2d 695
 Charles EDER, Mattie McDaniels and Philadelphia Welfare
Rights Organization, Appellants,
v.
Frank S. BEAL, Individually and as Secretary of the
Pennsylvania Department of Public Welfare; Thomas Hooker,
Individually and as Deputy Secretary for Family Assistance,
Department of Public Welfare; Roger Cutt, Individually and
as Commissioner of Medical Programs, Department of Public
Welfare; Glenn Johnson, Individually and as Director, Bureau
of Medical Assistance, Department of Public Welfare; Don
Jose Stoval, Individually and as Executive Director,
Philadelphia County Board of Assistance, Appellees.
 No. 79-1178.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 18, 1979.
Decided Nov. 14, 1979.
 
 R. Michael Kemler, Richard P. Weishaupt (argued), Community Legal Services, Inc., Philadelphia, Pa., for appellants.
 Carl Vaccaro (argued), Asst. Atty. Gen., Michael von Moschzisker, Deputy Atty. Gen., Eastern Regional Director, Edward G. Biester, Jr., Atty. Gen., Dept. of Justice, Philadelphia Pa., for appellees.
 Before SEITZ, Chief Judge, and GARTH and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This appeal presents us with a novel question: must Pennsylvania comply with the notice provisions governing the termination of an optional medical assistance program funded under Title XIX of the Social Security Act,[1] even when the discriminatory operation of the program has been held to have violated federal law?[2] The district court, while holding that Pennsylvania had not complied with the notice provisions of the Act, nonetheless held that the illegality of the program itself, Inter alia, prevented it from enforcing compliance with the notice provisions. Thus, the district court refused to enjoin the termination of the program. We disagree with the district court's order, and therefore we reverse.
 
 I.
 
 2
 As part of its federally funded medical assistance program,[3] Pennsylvania provided eyeglasses only to individuals with pathological eye disorders. Those individuals suffering from ordinary refractive error were not provided with eyeglasses. In White v. Beal, 555 F.2d 1146 (3d Cir. 1977), this court affirmed a district court order which enjoined the discriminatory operation of the Pennsylvania eyeglass program because this restrictive application was found to conflict with the requirements of the Social Security Act. This injunction set the stage for the instant litigation.
 
 
 3
 After the decision in White v. Beal, appellees, officials of Pennsylvania's Department of Public Welfare (DPW), who administered the eyeglass program, decided to eliminate the program entirely, citing substantial budget deficits.[4] This action had been foreseen in the earlier litigation which, as noted, had enjoined the eyeglass program. The district court had there concluded its opinion with the following prediction:
 
 
 4
 I am aware that as a consequence of this decision, Pennsylvania may elect to eliminate eyeglasses as one of the optional services. As an extreme measure, it might elect to discontinue entirely its participation in the federal medical assistance program under the Social Security Act. Thus, plaintiffs may sustain a pyrrhic victory that defeats rather than accomplishes their purposes.
 
 
 5
 White v. Beal, 413 F.Supp. 1141, 1155 (E.D.Pa.1976).
 
 
 6
 On July 30, 1977 DPW published notice of proposed rulemaking which would suspend the eyeglass program. On September 30, 1977, after comments had been received, the proposed rule went into effect unaltered, and the program was terminated. At that time, no individual notices of termination were sent to medical assistance recipients.
 
 
 7
 Thereafter in April, 1978, Chief Judge Lord enjoined DPW's termination of Pennsylvania's orthopedic shoe program because DPW had failed to comply with the individual notice requirements of Title XIX. Budnicki v. Beal, 450 F.Supp. 546 (E.D.Pa.1978) (no appeal taken). In response to the holding in Budnicki, on June 15, 1978, DPW sent notices to each medical assistance recipient informing them of DPW's earlier termination of the eyeglass program. These notices stated flatly that pre-termination hearings were unavailable because the termination "is an automatic reduction in covered services and there are no circumstances in which you could be incorrectly denied services." Appendix at 14.
 
 
 8
 Following the decision in Budnicki, the appellants here, who were the plaintiffs in White v. Beal, brought this action to enjoin the termination of the eyeglass program until the notice provisions of Title XIX could be met. They claimed that because those provisions unequivocally require that each individual recipient receive ten days notice in advance of a program's termination,[5] DPW was precluded from terminating its program without such notice. Having failed to provide any individual advance notice whatsoever, the plaintiffs argue that Pennsylvania is now obliged to operate an eyeglass program which conforms with the dictates of White v. Beal until such time as a timely and adequate notice is given I. e., for at least a ten day period.[6]
 
 
 9
 On cross motions for summary judgment, based upon a stipulation of facts, the district court held that DPW had "clearly" violated the notice provisions of 45 C.F.R. § 205.10(a)(4) (1978). But the court refused to enjoin the termination of the eyeglass program pending conformity with the notice requirements. Reasoning that in this case, unlike Budnicki, the underlying benefits program had been adjudged illegal, the court thought itself without power to order Pennsylvania to operate a "legal" eyeglass program in order to give effect to the notice requirements of Title XIX:
 
 
 10
 Plaintiffs seek to have the program reinstated, by means of an injunction against its termination, as in Budnicki, until it can be terminated in a manner consistent with statutory and constitutional requirements. Setting aside for the moment the patent incongruity of reinstating an unaffordable program simply to legitimize its retermination, there is one significant obstacle to this remedy that was not present in Budnicki : the program that the plaintiffs seek to have reinstated is, as the plaintiffs have correctly and successfully argued before this court and the court of appeals, illegal. It is indeed a nonsensical and illusory remedy that cures one illegality simply by conjuring up another.[5] Therefore, unless there is a very compelling need for such unusual relief, it will not be granted.
 
 
 11
 5. Plaintiffs themselves raise the possibility that the illegal eyeglasses program, once reinstated, might not be re-terminated for quite some time. They point to the present situation in Budnicki, where the DPW, in the seven months since the reinstatement of the PMA orthopedic shoe program, has taken no steps to reimpose the earlier cutbacks. It is clear to me in the context of the present case that every day that statutorily and constitutionally adequate re-termination is delayed will simply compound the initial folly of permitting the reinstatement of an illegal program. Thus, by choosing not to reinstate the PMA eyeglasses program, I rule out the possibility of such delay and the daily exacerbating effect that it would have upon the holding of White v. Beal, supra.
 
 
 12
 Nor is it within the power of this court to order DPW to initiate an expanded, legal eyeglasses program, I. e., one which makes eyeglasses available to all PMA recipients whose vision is in need of aid or improvement, without regard to whether they suffer from eye pathology or ordinary refractive error. As I recognized in White v. Beal, supra, the PMA eyeglasses program is optional, and the DPW can expand or eliminate it according to its best judgment. As Judge Fullam recently observed in Philadelphia Welfare Rights Organization v. Shapp, No. 73-290 (E.D.Pa., Oct. 3, 1978): "It is simply not in the province of a court to tell Congress, the Executive Branch, or the State government which services must be provided." 6
 
 
 13
 Appendix at 27-38 (footnote 6 omitted).
 
 
 14
 Moreover, the court noted that the expense involved in re-establishing the eyeglass program, the "speculative" nature of the benefits which would result from that action, and the good faith of the DPW officials were all "equitable factors" which weighed against granting an injunction.
 
 
 15
 We hold that the lower court erred as a matter of law, when it concluded that the prior illegality of Pennsylvania's eyeglass program precluded it from enforcing the notice requirements of Title XIX. Moreover, because this error infected the equitable determinations of the district court, and because there is little basis for those determinations, See note 12 Infra, we are satisfied that the district court did not exercise a sound discretion in denying an injunction for reasons of equity.
 
 II.
 
 16
 Federal courts are not reticent to fashion remedies to effectuate important statutory policies. See J. I. Case v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The policy favoring timely notice to social security recipients of agency actions terminating, suspending or reducing benefits comes within this protective ambit. Accordingly, courts interpreting the Social Security Act have uniformly recognized and upheld this policy. See, e. g., Rochester v. Baganz, 479 F.2d 603 (3d Cir. 1973); Budnicki v. Beal, supra; Yaretsky v. Blum, 592 F.2d 65 (2d Cir. 1979); Becker v. Blum, 464 F.Supp. 152 (S.D.N.Y.1978).
 
 
 17
 Rochester v. Baganz, supra, expresses this Circuit's view as to the importance of giving timely notice to beneficiaries of state programs. In Rochester, plaintiffs complained of Delaware's reduction of their AFDC benefits. Notice of this reduction had been sent to each recipient individually, but in an untimely fashion.[7] The court concluded that the Secretary of HEW was within his authority in requiring timely individual notice, even in cases of across-the-board program terminations where pre-termination hearings would not be required. The court stressed the importance of the notice requirement in light of the impact of program reductions on recipients' everyday lives:
 
 
 18
 The Secretary urges that even in cases of across-the-board reductions such advance notice is necessary, or at least appropriate, for the orderly administration of welfare programs. He urges that in a program designed to meet subsistence needs recipients ought to be informed in advance if their payments are to be cut for any reason, so that they may be able to plan for the cut, and to the extent possible adjust to it. We agree that it was well within the range of the Secretary's rulemaking authority to insist, as a condition for state participation in the AFDC program, that each state manage its fiscal affairs so as to be able to provide at least this minimum advance warning to beneficiaries about to be deprived of benefits upon which they may have been counting heavily.
 
 
 19
 479 F.2d at 606. This policy was read by the Rochester court to justify an independent right on the part of program recipients to timely notice in advance of any program change reducing benefits.[8] Even if we were not bound by the Rochester court's holding, we perceive no justification for permitting the violation of this important right[9] the right to receive timely and adequate advance notice to go without vindication and without remedy.[10]
 
 III.
 
 20
 Neither the fact that Pennsylvania's eyeglass program had been judged illegal, nor the fact that it is an optional program under Title XIX, would justify a failure to remedy a conceded violation of Title XIX's notice requirements.
 
 
 21
 The district court laid great stress on the fact that Pennsylvania's eyeglass program was held in White v. Beal, supra, to be in violation of Title XIX. This circumstance, according to the district court, left the recipients of benefits remediless, because it would be "nonsensical and illusory" to reinstate an illegal program where the court has no power to order the establishment of an expanded, "legal" eyeglass program. See Appendix 27 (quoted at 697-698 Supra). But Pennsylvania's obligation to maintain a legal program was not contingent on a court order in this case. Rather, when Pennsylvania elected to participate in Title XIX, and when it established its eyeglass program, it thereby bound itself to act in compliance with federal law. See Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). At that time its obligation arose. Thus, when the court in White v. Beal, supra, held that Pennsylvania was obligated, under Title XIX, to provide eyeglasses for individuals with refractive error as well as for individuals with eye pathology, it was, in essence, doing no more than recognizing the obligation which Pennsylvania had undertaken when it joined the federally funded program.
 
 
 22
 Consequently, we have no hesitancy in concluding that the district court incorrectly characterized the question before it as whether to "order DPW to initiate an expanded, legal eyeglasses program." Appendix at 27. Pennsylvania would not, in a legal sense, be initiating a new eyeglass program by providing services to persons with both categories of visual impairments; instead it would be bringing into conformity with the law the program which it had already established and which it was then maintaining.[11] Thus, the complaint in this case required the district court to focus only on Pennsylvania's concededly illegal termination of the eyeglass program. In this sense, the issue before the district court here does not differ significantly from the issue confronted by the district court in Budnicki v. Beal.
 
 
 23
 We hold that the district court erred, as a matter of law, in refusing to enjoin the termination of Pennsylvania's eyeglass program pending compliance with the notice requirements of Title XIX.[12] We recognize that this holding will necessarily cause Pennsylvania to conduct a full eyeglass program, providing benefits to recipients with ordinary refractive error as well as to recipients with eye pathologies, for the period before a legal notice may be effected. But this is no more than Pennsylvania obligated itself to do when it originally undertook the eyeglass program. In essence, our holding requires no more than that Pennsylvania "shape up" before it "ships out" of its federally sponsored program.[13]
 
 
 24
 Finally, the fact that Pennsylvania's eyeglass program was optional has no affect on our holding. If it were relevant, the "optionality" argument, taken to its logical extreme, would negate any requirement of notice before termination of benefits. For as we have already pointed out, See note 3 Supra, not only was the eyeglass program optional, but extending Title XIX benefits to the medically disadvantaged who do not meet all income standards, was also optional. Furthermore participation in Title XIX programs is, in the first instance, discretionary with the states. The fact that these programs are nominally "optional" does not mean that a state may terminate them without restraint. Rather, as we have previously indicated, once a state elects to participate in an "optional" program, it becomes bound by the federal regulations which govern it. Rosado v. Wyman, supra; King v. Smith, supra. This includes regulations governing the procedures by which a state may terminate programs which it has established.
 
 IV.
 
 25
 We conclude that the district court erred in its determination that our holding in White v. Beal prohibited it from enjoining the admittedly illegal program termination in this case. This determination also tainted the equitable considerations addressed by the district court. Thus the district court did not give effect to the policy underlying the notice requirements of 45 C.F.R. § 205.10, which we hold must be satisfied.
 
 
 26
 We will therefore vacate so much of the December 12, 1978 order of the district court which denied plaintiff's motion for injunctive relief and remand to the district court with the direction that an order be entered enjoining Pennsylvania from terminating its eyeglass program until it has complied with the requirements of 45 C.F.R. § 205.10 (1978).[14]
 
 
 
 [1]
 42 U.S.C. § 1396 Et seq. (1976)
 
 
 [2]
 The specific notice provisions involved in this case are found in regulations of the Department of Health, Education and Welfare codified at 45 C.F.R. § 205.10 (1978)
 
 
 [3]
 In order to qualify for funding under Title XIX, a state must provide at least five basic services to individuals who meet various income requirements. 42 U.S.C. § 1396a(a)(10)(A), (a)(13)(B). In addition, it may provide, and receive funding for, other services enumerated in 42 U.S.C. § 1396d. If it so chooses, the state may also extend its services to persons who do not meet these income requirements but who, nonetheless, have severe medical needs. 42 U.S.C. § 1396a(a)(10)(C). And, if this is done, these "medically needy" persons must be provided with either these five basic services or with seven of the sixteen services listed in § 1396d. 42 U.S.C. § 1396a(a)(13)(C). See also White v. Beal, 413 F.Supp. 1141, 1152 n.8 (E.D.Pa.1976). In all events, once a state has accepted federal funding under Title XIX, it is required to make All services available to All beneficiaries whether they qualify by meeting the income requirements or not. 42 U.S.C. § 1396a(a)(10)(B)
 In this case the eyeglass program provided by Pennsylvania is not one of the five basic services. Nevertheless, it was extended, at Pennsylvania's option, to both classes of beneficiaries whether they met the federal or Pennsylvania income standards as specified by statute. However, as we discuss in text above, these eyeglass services were limited to beneficiaries with pathological eye disorders and were denied to beneficiaries with refractive eye disorder, thus violating the Social Security Act. See White v. Beal, 555 F.2d 1146 (3d Cir. 1977).
 
 
 [4]
 The projected deficit for the Entire Pennsylvania Medical Assistance Program for fiscal 1978-79 was 66 million dollars. Appendix at 12 (Stipulation of Facts). This figure is somewhat misleading, however, because it was stipulated that the costs of an expanded eyeglass program (i. e. one covering both refractive and pathological eye disorders) are "minimal when compared with the cost of other PMAP services or with the cost of PMAP as a whole" Id
 
 
 [5]
 45 C.F.R. § 205.10(a)(4) (1978) states in relevant part:
 (4) In cases of intended action to discontinue, terminate, suspend or reduce assistance;
 (i) The State or local agency shall give timely and adequate notice, except as provided for in paragraphs (a)(4)(ii), (iii), or (iv) of this section. Under this requirement;
 (A) "Timely" means that the notice is mailed at least 10 days before the date of action, that is, the date upon which the action would become effective;
 (B) "Adequate" means a written notice that includes a statement of what action the agency intends to take, the reasons for the intended agency action, the specific regulations supporting such action, explanation of the individual's right to request an evidentiary hearing (if provided) and a State agency hearing, and the circumstances under which assistance is continued if a hearing is requested;
 
 
 [6]
 There is evidence that DPW did operate an "expanded" or "legal" eyeglass program for at least a limited period of time following the decision in White v. Beal. Charles Eder, who was a named plaintiff in both White v. Beal and this action and whose sole eye disorder was farsightedness, received DPW funded eyeglasses pursuant to this court's order in White v. Beal. But there is no evidence in the record that the class of medical assistance recipients was informed of the expanded eyeglass benefits available subsequent to this court's decision in White v. Beal
 
 
 [7]
 Rochester involved a prior version of 45 C.F.R. § 205.10, the regulation at issue in our case. It was identical with the current regulation in all respects except that it required prior notice of 15 days, rather than of 10 days
 
 
 [8]
 Recognizing that the appeal before it arose from cross motions for summary judgment, the Rochester court declined to fashion a remedy for the violation of the notice requirement. Instead, the court remanded to the district court so that a record could be made which could serve as the basis for a remedial order. In this regard, it should be noted that in Rochester prior individual notice had been sent to each recipient; but only 9 days' notice was given in advance of the program rather than the 15 days required by regulation. By contrast, in our case no notice in advance of termination of the eyeglass program had ever been given to individual beneficiaries
 
 
 [9]
 In passing, and without reaching or deciding any constitutional issue (no due process argument has been made here), we cannot avoid observing that this court has been particularly forceful in articulating a constitutional notice requirement in other Social Security Act benefits cases. In Klein v. Califano, 586 F.2d 250 (3d Cir. 1978) (en banc), and in Town Court Nursing Center, Inc. v. Beal, 586 F.2d 280 (3d Cir. 1978) (en banc) (Town Court II), cert. granted sub nom. O'Bannon v. Town Court Nursing Center, 441 U.S. 904, 99 S.Ct. 1990, 60 L.Ed.2d 372 (1979), our court required DPW to provide notice to nursing home residents who would have to be transferred to new facilities if their own homes were disqualified from federal Medicaid funding. This was required despite the fact that the nursing home itself was not accorded the right of pretermination appeal. See Town Court Nursing Center, Inc. v. Beal, 586 F.2d 266 (3d Cir. 1978) (en banc) (Town Court I). The court in Klein v. Califano and Town Court II justified the special notice and hearing rights which it accorded the nursing home residents by reference to Medicaid policy permitting individuals to live in facilities of their choice. See 42 U.S.C. § 1395a (1976). Since decertification of the facility necessarily leads to transfers of its patients, this policy was implicated. Consequently, the due process requirements of notice and hearings were triggered. See Klein v. Califano, 586 F.2d at 258; Town Court (II), 586 F.2d at 287 (Adams, J., concurring.) The policy favoring "freedom of choice" articulated in Klein v. Califano and in Town Court II are related to the concern that "recipients ought to be informed in advance if their payments are to be cut for any reason, so that they may be able to plan for the cut, and to the extent possible adjust to it," which justified this court's strict enforcement of 45 C.F.R. § 205.10 in Rochester v. Baganz 479 F.2d at 606. We would be hard pressed to justify not extending our solicitude to a statutory notice requirement, such as the one in this case, when we have previously shown such solicitude toward similar notice requirements in a constitutional context
 
 
 [10]
 The Second Circuit has taken a similar, strict view of the notice requirements of Title XIX. In Yaretsky v. Blum, 592 F.2d 65 (2d Cir. 1979), the Second Circuit was faced with an attempt to transfer certain types of patients from a hospital to a reduced care facility. The affected persons were notified of the transfer by the hospital, but, in contravention of regulations, they were not notified by the administrative agency responsible for the program. Because of this failure to comply with the notice requirements, the entire transfer was enjoined. See also Becker v. Blum, 464 F.Supp. 152 (S.D.N.Y.1978)
 Similarly, in Budnicki v. Beal, supra, Chief Judge Lord enjoined Pennsylvania from terminating its orthopedic shoe program without complying with the requirements of 45 C.F.R. § 205.10. Since an illegal termination had already occurred, this necessarily meant that the program had to be reinstated. The district court in this case distinguished Budnicki on the ground that Pennsylvania's eyeglass program itself, distinct from the manner of termination, had been ruled illegal. As will be discussed, Infra, we do not find this distinction to be significant. Accordingly, since the decision reached in Budnicki, which was not appealed, comports with our own views expressed, we specifically approve of Chief Judge Lord's discussion of the requirement of "timely" notice under the Social Security Act. We need not comment, however, and therefore express no opinion, on Chief Judge Lord's treatment of the statutory "hearing" requirement, since that issue is not presented in this case.
 
 
 [11]
 Indeed, there is evidence in this case which indicates that Pennsylvania did operate its eyeglass program on an expanded basis for a short time after the decision in White v. Beal. See note 6, Supra. Thus, the district court was not in fact required to force Pennsylvania to "initiate" a new program. Rather, the question before the court involved simply the admittedly illegal termination of the program which Pennsylvania had apparently been operating
 
 
 [12]
 The "equitable considerations" cited by the district court, See 698, supra, do not compel a different result. It is true that Pennsylvania will incur additional expenses in complying with this order. But all of the Social Security Act cases which upheld the notice requirements, See, e.g., Yaretsky v. Blum, supra; Budnicki v. Beal, supra, imposed additional costs on the states. In Budnicki, for example, the orthopedic shoe program, whose termination was enjoined, cost Pennsylvania over two million dollars in fraud loses in fiscal 1977. 450 F.Supp. at 550. By contrast, the stipulated record in this case suggests that the costs of an "expanded" eyeglasses program would not be great. See note 4, Supra
 Second, there is no record in this case upon which the district court could have determined that the benefits of the injunction would be "speculative." Certainly, it can be anticipated that some medical assistance recipients will receive eyeglasses during any notice period prior to termination.
 Finally, although there is little reason to doubt that DPW acted in good faith, we fail to see the relevance of the district court's conclusion in this regard. Surely, even a good faith violation of a notice right requires a remedy.
 
 
 [13]
 Appellees argue that an injunctive remedy is barred by the eleventh amendment because Medicaid recipients will be enabled to apply for benefits which had been denied before White v. Beal. See, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Rochester v. White, 503 F.2d 263 (3d Cir. 1974). We reject this argument. The injunction sought is prospective only; it simply enjoins termination until the requirements of Title XIX are met. The fact that the state may incur costs in complying with the federal mandate upheld by this injunction is no barrier. Milliken v. Bradley, 433 U.S. 267, 290, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). Nor does the fact that the injunctive order itself may induce class members to file for benefits create additional eleventh amendment problems. See Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)
 
 
 [14]
 We give no direction and express no opinion as to whether that portion of the district court's order which concerns costs and attorneys fees should be modified on remand in light of our disposition here. We leave that matter entirely to the discretion of the district court