FORBES HEALTH SYSTEMS, a
corporation, Plaintiff,

v.

Patricia HARRIS, as Secretary of the U.
S. Department of Health Education &
Welfare, Helen O'Bannon, Individually
and as Secretary of Pennsylvania De-
partment of Public Welfare, Glenn
Johnson, Individually and as Director of
the Bureau of Medical Assistance of the
Pennsylvania Department of Public
Welfare, Defendants.

WASHINGTON HOSPITAL, South Hills
Health System, All Saints Hospital,
Lock Haven Hospital and Andrew Kaul
Memorial Hospital, Plaintiffs,

v.

Helen B. O'BANNON, Individually and as
Secretary of the Department of Public
Welfare of the Commonwealth of Penn-
sylvania, and Gerald F. Radke, Individu-
ally, and as Deputy Secretary for Medi-
cal Assistance of the Department of
Public Welfare of the Commonwealth of
Pennsylvania, Defendants.

Civ. A. Nos. 79–1811, 80–1106.

United States District Court,
W. D. Pennsylvania.

Dec. 15, 1980.

Charles R. Taylor, Jr., Thomas E. Boyle,
Moorhead & Knox, Pittsburgh, Pa., Kay E.
Tucker, Duane, Morris & Heckscher, Phila-
delphia, Pa., William C. Andrews, Goehring,
Rutter & Boehm, Pittsburgh, Pa., for plain-
tiffs.

John Knorr, III, Deputy Atty. Gen., Pa.
Dept. of Justice, Harrisburg, Pa., Lawson
Johnston, Asst. Atty. Gen., Pa. Dept. of
Justice, Pittsburgh, Pa., Diane C. Moskal,
Asst. Regional Atty., Dept. of HEW, Phila-
delphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

TEITELBAUM, District Judge.

The plaintiffs in the instant action have
challenged the validity of certain Pennsyl-
vania regulations, which are set out in per-
tinent part, *infra*, concerning the adminis-
tration of the Medicaid program in Pennsyl-
vania,[1] averring that those regulations vio-

---

1. The Medicaid program is a cooperative un-
dertaking of the federal and state governments
to purchase needed medical care on behalf of
eligible persons. States may elect whether or
not to participate in the Medicaid program, but
once having made an election the state must
comply with federal guidelines. For a fuller

late federal standards for the Medicaid program. It has also been alleged that the challenged regulations violate the due process provisions of the United States Constitution. The jurisdiction of this Court has been properly invoked to resolve this federal question. The plaintiffs seek to have the Pennsylvania regulations declared invalid and seek a permanent injunction against the implementation and enforcement of the challenged regulations.

The Forbes Health System (hereinafter Forbes) initially challenged the interpretation and enforcement of Pennsylvania regulations as being discriminatorily applied against Forbes and also challenged the regulations to the extent that a hospital-based skilled nursing facility is required to be located at the same site as the acute care facility with which the skilled nursing facility is affiliated. After Forbes obtained preliminary relief against discriminatory application of the regulations,[2] the related action was brought be several other similar institutions. As part of the comprehensive challenge made in the related action to Pennsylvania Medicaid regulations, two of the plaintiffs, Washington Hospital and the South Hills Health System (hereinafter South Hills) raised the same site or colocation issue that was the subject of the action brought by Forbes. To avoid unnecessary delay and with consent of all the parties, these two actions were consolidated for a hearing on permanent relief with respect to the challenge to the site requirement. A hearing on this issue was held on September 15-16, 1980. The opinion is intended to address the site issue, only.

The evidence established that in 1973, the Pennsylvania Department of Public Welfare (hereinafter DPW)[3] issued the first and, at that time, the only regulation which separated skilled nursing facilities into the two categories; hospital-based and non-hospital-based. That regulation read, in pertinent part:

Nursing facilities desiring to participate . . . under Medical Assistance [Medicaid] . . . must meet the following requirements:

.      .      .      .      .

(c) A hospital-based skilled nursing home must be licensed or approved by the Office of Medical Programs and/or certified for Title XVIII (Medicare) participation.

Medical Assistance Manual § 9424.6 (hereinafter 73 Reg.)

This distinction was used to provide a higher reimbursement rate to hospital-based skilled nursing facilities than for non-hospital-based skilled nursing facilities. This difference in reimbursement rates continues to the present, although the actual rates have been modified at various times.

That regulation remained the sole relevant effective regulation until October of 1978 when a new section was added to the existing body of regulations. That section stated, in pertinent part:

*Payments to hospital-based distinct part SNF [Skilled Nursing Facility] units.*

Reimbursement under a separate statewide ceiling is available only to those hospital-based facilities meeting the participation requirements under § 9424.6 [73 Reg.] and the following additional requirements and conditions.

(1) The hospital is utilizing former acute care hospital beds that have been converted to and certified for skilled

explanation, *see Eder v. Beal*, 609 F.2d 695, 696 n.3 (3rd Cir. 1979).

**2.** On May 21, 1980, this Court issued an injunction *pendente lite* requiring that the skilled nursing facility operated by Forbes be treated the same as other skilled nursing facilities affiliated with acute care facilities but not on the same site as the acute care facility for purposes of Medicaid reimbursement. This order was technically complied with by reclassifying all such institutions as non-hospital based for the then current fiscal year which had begun on July 1, 1979.

**3.** The Commonwealth of Pennsylvania and its agency, the Department of Public Welfare, have been dismissed. The above reference to DPW and all future references should be understood to be a shorthand reference to the other defendants in these two actions who are employed by DPW; specifically DPW refers to defendants, O'Bannon, Johnson and Radke.

nursing care.... separate reimbursement may be available to a hospital that constructs new skilled nursing beds if the need for the bed is determined by the [appropriate] ... agency....

(2) The hospital must substantiate to the Department that it is economically feasible to operate a distinct part SNF unit....

55 Pa.Code § 9424.7121; Pennsylvania Bulletin, Vol. 8, No. 41, October 14, 1978 (hereinafter 78 Reg.)

The only other change in the definitional language for hospital-based skilled nursing facilities became effective, if at all, on March 8, 1980. The regulation promulgated at that time substituted the following material, quoted in pertinent part, for the 73 Reg.:

Nursing facilities desiring to participate in the Skilled Nursing Facility Care and Service Program under Title XIX, Medical Assistance [Medicaid], must meet the following requirements:

(1) *State licensure or approval.*

(a) A proprietary, nonproprietary, or hospital-based skilled nursing facility must be licensed or approved by the Department of Health. A skilled nursing facility certified for Title XVIII [Medicare] is automatically eligible to participate in the Medical Assistance Program.

(b) A hospital-based skilled nursing facility is a distinct part unit that is located within or on the immediate grounds of a general hospital that is licensed.... Also the distinct part facility shares support services and administrative costs of the hospital. The hospital services shall be available to the general public....

55 Pa.Code § 9424.6; Pennsylvania Bulletin Vol. 10, No. 10, March 8, 1980 (hereinafter 80 Reg.)

Concentrating on the site issue, the challenge brought by the various plaintiffs focuses on the explicit language of the 80 Reg. which requires colocation; the conversion of acute care beds to skilled nursing care beds required by both the 78 Reg. and the 80 Reg. to the extent that conversion implicitly requires colocation;[4] and the term "hospital-based" used in all the challenged regulations to the extent that term has an implied colocation meaning. The plaintiffs assert that no colocation requirement existed until the 80 Reg. was adopted and that this requirement is not a "reasonable cost related basis" for reimbursement as defined in 42 U.S.C.A. § 1396a(a)(13)(E) and thus is improper for use in connection with the Medicaid program. The plaintiffs further contend that they have relied on the construction of the regulations to their detriment so that should the change effected by the 80 Reg. adding a colocation requirement be valid a "grandfather clause" must be included to avoid a violation of substantive due process that would be caused by the otherwise dramatic change in the applicable regulations. The DPW contends that the regulations are and have been clear, that there has been no change in policy and that the regulations are valid as written.

To fully understand the meaning attached to "hospital-based" by the plaintiffs, it is necessary to review briefly the history of each of the plaintiffs. Prior to 1978, Forbes, a non-profit corporation, operated the Pittsburgh Hospital and the Columbia Hospital. With the opening of the East Suburban Health Center, another part of Forbes, the acute care functions of the Pittsburgh Hospital were transferred to the Columbia Hospital. The facility that housed the Pittsburgh Hospital was thereafter converted to contain a skilled nursing facility and a hospice. That skilled nursing facility is approximately six miles from the East Suburban Health Center and two miles from Columbia Hospital.

While Forbes contemplated this conversion of the Pittsburgh Hospital, an integral component in the plan which made the East Suburban Health Center possible, and spent

---

4. To the extent that the conversion requirement is a requirement, without reference to colocation, the validity of that requirement is the subject of the comprehensive challenge still pending before this Court.

considerable sums to make the conversion a reality, the only existing relevant regulation was the 73 Reg. Forbes, having determined that similar operations were in existence, expected to receive the reimbursement rate associated with hospital-based skilled nursing facilities for services rendered to Medicaid patients. Because of the site requirement, cited for the first time ever by DPW, the lower reimbursement rate associated with non-hospital based skilled nursing facilities was deemed appropriate by DPW. The lower reimbursement rate has caused Forbes to be entitled to at least $130,000 less than if the skilled nursing facility had been classified as hospital-based.

This precarious situation for the Forbes skilled nursing facility is not the result of poor management, but rather is the result of higher costs generated by Forbes in providing the more intensive care needed by the patients that Forbes, in keeping with area wide health care goals, selects to compose its patient mix. More simply, because of the hospital affiliation enjoyed by the skilled nursing facility, Forbes can and does treat sicker patients than do non-hospital-based facilities and the selection of patients made by Forbes facilitates area wide health care by concentrating the more sickly in a few institutions.[5] However because of the sicker patient that is handled at Forbes, and because those patients need more intensive care, Forbes' cost of treatment is greater than that at non-hospital-based skilled nursing facilities. Some of these higher costs can be traced to the greater sums paid in salary by Forbes, sums that are necessary because to provide intense levels of care Forbes must employ trained nurses at greater wages than paid to aides used elsewhere and the nurses must be employed in proportionately greater numbers to provide the greater number of hours of care per patient that are appropriate under the circumstances.

In addition, in computing costs at Forbes skilled nursing facility approximately $30 of the total daily per patient cost of $70 is due to costs associated with shared services. Those services range from finance to music therapy. Costs for those services are allocated using constraints imposed by accounting principles and relationships between Forbes and third party payors, including Medicare. These constraints ultimately restrict Forbes to use of one allocation mechanism, the stepdown methodology. Without belaboring details of accounting, this methodology is the mechanism for allocating overhead to various units within any given institution. Because the skilled nursing facility depends upon services associated with the hospital, the skilled nursing facility bears a proportion of the overhead for those services. This allocation does not occur in non-hospital-based skilled nursing facilities which, by and large, contract for services with outsiders. By contracting there is no overhead to allocate, but rather only the contract cost. Because hospital-based skilled nursing facilities must use the stepdown methodology, they cannot "contract" with the hospital with which they are associated. This accounting process does lead to higher costs but those costs are rooted in the more intense level of care that is available because of the ready access to the shared services.

The other plaintiffs are similarly situated. Washington Hospital also operates a skilled nursing facility located approximately two miles from the acute care facility. The skilled nursing facility, opened in 1970 to meet area wide health care needs, shares a great number of services with the hospital. Patients in the skilled nursing facility, in many instances, could qualify for hospital confinement with its higher costs if the level of skilled nursing care available at the Washington Hospital skilled nursing facility was not in existence. Like Forbes, Washington Hospital is faced with higher costs because of costs associated with providing the more intense level of care and costs

---

**5.** This is not to suggest that non-hospital-based facilities are in any way providing less than ideal care, rather only that Forbes is able to provide a different service on the continuum of health care services to persons with somewhat different needs.

allocated by the stepdown methodology. The potential loss to date if Washington Hospital is not classified as a hospital-based skilled nursing facility amounts to well over $350,000.

South Hills, the last of the present plaintiffs, operates a skilled nursing facility, the Willis Center, which is approximately seven miles from the acute care facility it is associated with, Jefferson Hospital, another component of South Hills. South Hills began in 1973 with the merger of St. Joseph's Hospital and Homestead Hospital. After the merger, South Hills opened Jefferson Hospital and closed St. Joseph's and Homestead. The St. Joseph's facility was sold and Homestead Hospital, which had had a skilled nursing facility of 38 beds as well as the acute care facility, eventually was converted to house a skilled nursing facility with 76 beds, called Willis Center.

Much like Forbes and Washington Hospital, patients at the Willis Center receive a more intensive level of care than patients in non-hospital-based skilled nursing facilities. This heightened level of care is possible because of the shared services between the acute care facility and the skilled nursing facility; the greater percentage of nurses rather than aides, and the greater number of hours of care per patient. The existence of the Willis Center permits transfer to that facility, at significant savings, of patients who otherwise would remain hospitalized at Jefferson Hospital and other area acute care facilities. The Willis Center is on the continuum of health care providers and with improved patient health, every effort is made to transfer patients to more appropriate, less costly, facilities. Costs at Willis Center are higher than at non-hospital-based skilled nursing facilities because of the greater costs associated with the level of care provided and the stepdown methodology. As a result, not being classified as hospital-based creates a loss of over $50,000 for the South Hills compounding greatly other sources of loss.

Collectively, the plaintiffs have established that they all operate skilled nursing facilities within a short distance of the acute care facility with which they are associated, though the skilled nursing facilities are not on the same physical site as the acute care facility; that all skilled nursing facilities were in existence or had substantial sums of money committed to their creation prior to the effective date of change in Regulations in 1978; that all the skilled nursing facilities provide care to seriously ill patients who often could qualify for hospitalization if such skilled nursing facilities were unavailable; that this level of care is needed; that higher costs associated with this care are related to its provision, in terms of the hiring of more qualified people in greater numbers, in the greater amount of hours of care provided and in the required use of certain accounting principles; and that if these facilities are not classified as hospital-based skilled nursing facilities, significant financial losses have and will occur jeopardizing the access to the facilities by Medicaid patients if not the very existence of the facilities themselves. DPW has not, in the main, contradicted the evidence offered by the plaintiffs describing the services provided by them. Instead, the DPW has insisted that the Medicaid regulations, which are at issue, undeniably show that the DPW has had a policy to reduce the total payments made to all acute care facilities under Medicaid for excess acute care beds, beds for which Medicaid provides reimbursement through depreciation allowances, by creating a financial incentive for conversion of those beds to beds in a skilled nursing facility.[6] This policy is said to have been established in 1973 and that all changes in the regulations to date have been mere classifications of that long standing policy. DPW urges this Court to find that the reduction of costs and not the desire to purchase a different level of care was the purpose in creating the hospital-based skilled nursing facility reimbursement category. DPW identifies the flexi-

6. Savings are said to result because of the substantially lower rate of reimbursement paid by Medicaid to hospital-based skilled nursing facilities as compared with the rate for acute care facilities.

bility in the design of the program as the source of the right to create this policy. DPW admits that the plaintiffs do lose money but emphasizes that the skilled nursing facilities provide extraordinary levels of care, a service for which the Medicaid program does desire to provide, and suggests that the facilities are losing money because of inefficient operations. South Hills, which even if classified as operating a hospital-based skilled nursing facility would lose money, is said by DPW to be an example of this inefficiency.

This Court is unpersuaded by these arguments.[7] It is not at all clear from the 73 Reg. or the 78 Reg. that any policy of cost reduction was ever the motivation behind the establishment of the hospital-based skilled nursing facility categories. The suggestion that "hospital-based" in the 73 Reg. implicitly contained a colocation requirement is absurd even if DPW's assertion that the meaning of the word, hospital, has undergone some recent evolution is correct. To now suggest that hospital-based could only, and clearly did, refer to the physical proximity of the skilled nursing facility to an acute care facility is to ask far too much of the English language. In designing and operating skilled nursing facilities, the plaintiffs reasonably and rationally interpreted hospital-based to mean hospital-affiliated and to refer to a skilled nursing facility that had the resources of an acute care facility at its immediate disposal. This relationship, envisioned by the plaintiffs, provides a new alternative on the continuum of the levels of health care services with attendant cost savings being generated by the provision of more appropriate care for a class of persons needing more care than

non-hospital-based skilled nursing facilities could provide but less than that available at acute care institutions. This interpretation, shared by all the plaintiffs, individually, also appears from DPW documents, and through the testimony of Dr. Cutt, a former DPW employee, and others to have also been the prior interpretation of this regulation by DPW. These facts satisfy this Court that the 73 Reg. never has, and still does not, contain any implicit colocation requirement.

The 78 Reg. is also said to have embodied an implicit colocation requirement as part of the conversion requirement. The argument proceeds that to convert from acute care beds to skilled nursing beds, the acute care facility would of necessity be adjacent to the remainder of the acute care facility. The flaw in this proposed interpretation is readily visible with reference to the experiences of both South Hills and Forbes. South Hills and Forbes built entirely new acute care facilities and converted the former acute care plant to a skilled nursing facility. These two examples show the meaningful interpretation that the plaintiffs understood to be the subject of the 78 Reg. These interpretations also appear to have been the understanding of DPW, prior to the beginning of the instant litigation as DPW did not assert a colocation requirement until Forbes submitted its application. For these reasons, this Court finds that the 78 Reg. does not, and never did, contain an implicit colocation requirement.[8] Thus, at least until the publication of the 80 Reg. no colocation requirement can be said to have existed. For this reason, it would have been improper to deny reimbursement prior to the stated effective date of the 80 Reg.[9]

---

7. Though South Hills would lose money even if Willis Center is classified as a hospital-based skilled nursing facility, this Court is more inclined to believe that charitable motives inherited from the administration by a religious order of St. Joseph's Hospital, a premerger component of South Hills, are more likely to have been responsible for such losses as a result of providing low-priced care with some attendant shortfall in income, rather than any inefficiency.

8. The 78 Reg. is subject to a comprehensive challenge currently before this Court, in a related action. For this reason, this Court notes that it does not imply that the 78 Reg. is proper as now interpreted but rather only that the 78 Reg. as interpreted is inapplicable to the present controversy.

9. The Court notes that the words distinct part facility might be focused upon by some for the implication that colocation was in fact required. This argument has not been pressed before this Court and would also appear to fail

The 80 Reg. explicitly does require that a skilled nursing facility be colocated with its affiliated acute care facility in order to be eligible for reimbursement as a hospital-based skilled nursing facility. However before the change proposed by the 80 Reg. could be effective approval would be needed from the Secretary of Health and Human Services (hereinafter HHS or HEW).[10] Recently the appropriate scope of HHS review was the subject of federal appellate review in *Alabama Nursing Home Ass'n v. Harris*, 617 F.2d 388 (5th Cir. 1980). There the Court elaborated upon the obligation of HHS.

### HEW's obligation

Section 1396a(a)(13)(E) obligated HEW to approve and verify the cost-finding methods utilized in a state's reimbursement plan. However, Congress clearly intended that HEW's obligation to approve and verify extended beyond the cost-finding methods so as to accompany the state's proposed rate-setting methodology.

The States would use acceptable cost-finding techniques ... to determine reasonable reimbursement and apply to the results appropriate methodologies for determining payment. *The methods would have to be approved and validated by the Secretary [of HEW].*

Senate Report at 287. HEW previously has recognized and accepted this enlarged obligation.

The language of the Committee Report makes clear that *the State's methodologies for rate setting, as well as the State's methods for cost finding are subject to the Secretary's approval.*

... In light of the concern expressed in the legislative history of section [1396a(a)(13)(E)] about the dangers to the objectives of Medicaid statute of either underpayment or overpayment

of long-term case facilities, *the Secretary [of HEW] in carrying out his statutory functions of reviewing, approving, and verifying the State's methodologies, has the responsibility to assure that the methodologies will in fact result in reasonable cost related reimbursement....*

*Alabama Nursing Home Ass'n v. Harris*, 617 F.2d at 393 (5th Cir. 1980) (emphasis in original). In reviewing the rate-setting methodology HHS would undoubtedly need to determine if the classes for which rates were to be set were appropriately defined; for if the classes were not so defined then the rates could not be set in any meaningful way.

It appears that this prerequisite has never been satisfied. The testimony of Milton Dezule establishes that the changes proposed by the 80 Reg. were never presented to HHS for review. With no regulation before it, HHS obviously could not have approved any change in the Pennsylvania plan. Since the 80 Reg. has not been approved by HHS, it is invalid.

Having held the 80 Reg. invalid, this Court must determine what is appropriate relief. Since the 80 Reg. was never submitted to HHS for review the defect in its promulgation could conceivably be cured; DPW might now submit the 80 Reg. to HHS for approval. However, DPW has other options; DPW may decide not to submit to HHS the 80 Reg. but rather a different regulation or perhaps no regulation. This decision is vested within the discretion of state officials. For this Court to order that a specific regulation, such as the 80 Reg., be submitted to HHS would be to improperly usurp the discretion vested in DPW. This the Court will not do. Therefore, the appropriate relief is to order that no colocation requirement be enforced unless and until HHS approves a regulation with such a requirement.

---

if presented. In referring to a distinct part, the regulations require that certain beds be regularly and exclusively used for skilled nursing care and that these beds not be scattered amidst beds used for different levels of care.

**10.** The functions of the Department of Health, Education and Welfare were transferred to the Department of Health and Human Services by Pub.L.No. 96-88, 93 Stat. 696.

As the 80 Reg. might not be submitted to HHS, it is unnecessary at this time for the Court to consider the remainder of the issues raised by the plaintiffs. No doubt HHS will fulfill its statutory mandate and determine whether or not any regulation actually before it contains a reasonable cost related basis for reimbursement in light of the evidence presented to it by various interested persons. The Court is also satisfied that HHS is competent to and will consider in evaluating all evidence before it whether any proposed change in the regulation will violate the substantive due process rights of any person affected by the proposed change. Since there is no evidence to suggest HHS will not meet its reviewing obligations, it is premature to consider injunctive relief against HHS. Should any person, after consideration and approval of a proposed change in the applicable regulations by HHS, be aggrieved, at that time, that person may again have recourse to the courts. The foregoing shall constitute findings of fact and conclusions of law as required by Rule 52(a) of the Rules of Federal Civil Procedure. An appropriate order will issue.